UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JANIS PARKER,
parent and next of friend of T.P., a minor,

    Plaintiff,

        v.

FRIENDSHIP EDISON PUBLIC
CHARTER SCHOOL,

    Defendant.

Civil Action 05-188 (JMF)

**MEMORANDUM OPINION**

Janice Parker brings this action on behalf of her minor daughter T.P. against Friendship Edison Public Charter School ("Edison") under the Individuals with Disabilities Education Act ("IDEA" or "the Act"), 20 U.S.C. §§ 1400 (2006), et. seq., and D.C. Code § 38-2501 (2001) (current version at D.C. Code § 38-2561.02 (Supp. 2008).  The IDEA provides that all children with disabilities will be provided a free and appropriate public education ("FAPE"), and provides for procedural safeguards to ensure that disabled children receive individualized education programs to fulfill the Act's goals.  Ms. Parker argues that Edison did not conduct an adequate evaluation of T.P., that it failed to comply with the timetable set forth in D.C. Code § 38-2501, and that T.P. was improperly diagnosed and denied special education services.  For the reasons stated herein, Plaintiff's Motion for Summary Judgment [#29] ("Pl. Mot.") will be denied, and Defendant's Motion for Summary Judgment And Opposition to Plaintiff's Motion for Summary Judgment [#31] ("Def. Mot.") will be granted.

**I.      Background**

During the 2003-2004 school year, Ms. Parker informed school officials that T.P. was having behavioral difficulties, had made statements about suicide, and that her grades had dropped markedly from the previous school year.  Administrative Record [#28] ("AR") at 49, 172.  These developments prompted her to request that T.P. be evaluated for special education services.  AR at 108.  That request, made on March 18, 2004, sought the following tests: psycho-educational, speech and language, clinical, social history, occupational therapy (if warranted), hearing and vision, and classroom observation.  Id.

   **A.     Evaluations**

On May 18, 2004, Edison conducted a thorough Psycho-educational and Clinical Evaluation of T.P., consisting of numerous tests and interviews.  AR at 48, 57-58.  T.P.'s cognitive functioning was found to be within the borderline range, and she was described as academically bright but inhibited by certain behavioral issues.  AR at 50-55.  T.P. had attended three different schools prior to entering third grade at Edison, and these changes were seen as an important component of her academic difficulties – particularly given her "honor roll" performance at her previous school.  AR at 49.  She also had feelings of loneliness and abandonment as a result of her lack of contact with her father.  AR at 85.  The evaluating psychologist, Dr. Keisha Mack, diagnosed T.P. with "adjustment disorder" and recommended an "occupational therapy evaluation, individual psychotherapy weekly, social skills training/group therapy, a behavior plan and that [Ms. Parker] should monitor the student's television viewing, particularly programs that are violent in nature."  AR at 55-56.  No recommendation was made for special education services.  A list was provided by Dr. Mack of individually-tailored

suggestions and accommodations to assist T.P.'s teachers in advancing her academic and behavioral development. AR at 59. Ms. Parker challenged the "adjustment disorder" diagnosis with Dr. Mack but, after further review, the diagnosis was affirmed by her supervisor. AR at 89.

A Speech and Language Evaluation, conducted on May 19, 2004, found T.P.'s expressive language and vocabulary skills to be at an appropriate level. AR at 60-63. An Audiological Evaluation administered on June 21, 2004, did not uncover any abnormalities. AR at 66.

A Social Work Evaluation was conducted on June 27, 2004, and recommended that T.P. participate in weekly psychosocial counseling to help her deal in a constructive manner with feelings of frustration, anger, and sadness. AR at 70. The evaluator also recommended that a child psychiatrist be consulted because "medication may be an appropriate treatment option to help [T.P.] control her behavior and allow her to be more available for learning." Id. No recommendation was made for special education services.

    B.    **Multidisciplinary Team**

A multidisciplinary team ("MDT")[1] convened on August 12, 2004, with Ms. Parker in attendance. AR 71-78. The results of the evaluations were discussed and, as in the case of Dr. Mack, some evaluators were present to answer questions. It was ultimately agreed that T.P. suffered from adjustment disorder, a temporary condition that did not qualify for special education services, and that her "cognitive abilities and achievement are commensurate [with her age]." AR at 83, 85. The MDT agreed that: (1) T.P. would begin individualized therapy and group therapy; (2) T.P. would receive a functional behavior assessment and an occupational evaluation; (3) it would reconvene within thirty school days to discuss the results and to craft a

---

[1] An MDT consists of the parents and teachers of the disabled student, as well as other educational specialists, who meet and confer in a collaborative process to determine how best to accommodate the needs of the student and provide a FAPE. See D.C. Mun. Regs. tit. 5, § 3006.5 (2006).

3

behavior plan; (4) Edison would develop a "504 Plan"[2] for counseling based on Dr. Mack's recommendations; and (5) it would reconvene in three months to "revisit the adjustment disorder classification and to determine if [T.P.] needs further evaluations." AR at 83-85.

### C.     The Plaintiff's Allegations

On July 22, 2004, after the evaluations were completed but before the MDT meeting, Ms. Parker requested a due process hearing on the basis that Edison failed to comply with D.C. Code § 38-2501 by not conducting a timely and comprehensive evaluation of T.P. AR at 102-104. She amended her request after the MDT meeting to include an allegation that T.P. was not given a complete evaluation and was wrongly denied special education services. AR at 22. More specifically, she argued that T.P. should have been diagnosed as "Other Health Impaired." Id.

The due process hearing was held on October 14, 2004. Ms. Parker was supposed to attend the hearing and testify, but only her counsel appeared.[3] Transcript of Proceedings ("Tr.") at 2. No new evidence or testimony was introduced. Hearing Officer David R. Smith issued his decision on November 3, 2004. AR at 1-5. He described the evaluations that had been performed and noted that none of them indicated that T.P. was in need of special education services. He concluded that, based on the record, the remedial plan set forth by the MDT, which included a future reassessment, was in T.P.'s best interest. AR at 5. Ms. Parker unsuccessfully moved for reconsideration of the decision prior to filing the present lawsuit AR at 6.

---

[2]     A 504 Plan is a legal document designed to plan a program of instructional services to assist students with special needs who are in regular education settings.

[3]     The hearing had previously been rescheduled to accommodate Ms. Parker, in part because her testimony was described by her counsel as "very important in this matter." AR at 36.

4

**II.     Legal Standards**

   **A.     Summary Judgment**

The parties have cross-moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, which provides for entry of summary judgment "if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Where, as here, neither party seeks to present additional evidence, a motion for summary judgment "operates as a motion for judgment based on the evidence comprising the record." Jenkins v. Dist. of Columbia, No. 02-cv-1055, 2005 WL 3371048, at *2 (D.D.C. Dec. 12, 2005); see also 20 U.S.C. § 1415(i)(2)(C) (2006) (permitting the Court to hear additional evidence at the request of a party).

   **B.     Judicial Review and the the IDEA**

The IDEA permits a party to seek review of a hearing officer's decision in state or federal court. 20 U.S.C. § 1415(i)(2)(A). The court reviewing the hearing officer's decision shall review the administrative record, hear additional evidence at the request of a party, and "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The court shall base "its decision on the preponderance of the evidence," 20 U.S.C. § 1415(i)(2)(C)(iii), a standard that gives "due weight" to the hearing officer's decision. Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982). Courts may not "substitute their own notions of sound educational policy" for those of the hearing officer, see id., though "less deference [is due] than is conventional" in administrative proceedings. Reid ex rel. Reid v. Dist. of Columbia, 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting Kerkam v. McKenz, 862 F.2d. 884, 887 (D.C. Cir. 1988)). The party "challenging the administrative determination must at least take on the burden of persuading the

court that the hearing officer was wrong, and [] a court upsetting the officer's decision must at least explain its basis for doing so." Id.

**III.   Discussion**

Ms. Parker argues that Edison did not conduct an adequate evaluation of T.P., that it failed to comply with the timetable set forth in D.C. Code § 38-2501, and that T.P. was improperly diagnosed and denied special education services. Each of these arguments will be addressed in turn.

**A.   The Evaluation**

D.C. law requires that a "a full and individual evaluation is conducted for each child being considered for special education and related services." D.C. Mun. Regs. tit. 5, § 3005.1 (2006). "Qualified evaluators [are to] administer tests and other assessment procedures as may be needed to produce the data required" for the MDT to make its determinations. D.C. Mun. Regs. tit. 5, § 3005.5 (2006). The evaluators shall utilize "a variety of assessment tools and strategies [to] gather relevant functional and developmental information about the child, including information provided by the parent, and information related to enabling the child to be involved in and progress in the general curriculum . . . that may assist in determining whether the child is a child with a disability." D.C. Mun. Regs. tit. 5, § 3005.9(b) (2006). The focus should not be on obtaining a "single general intelligence quotient," but should instead include tests "tailored to assess specific areas of educational need." D.C. Mun. Regs. tit. 5, § 3005.9(d) (2006). All areas "related to the suspected disability" should be assessed, including: academic performance, health, vision, hearing, social and emotional status, general intelligence (including cognitive ability and adaptive behavior), communicative status, and motor abilities. D.C. Mun. Regs. tit. 5, § 3005.9(g) (2006). The evaluations must be "sufficiently comprehensive to identify

all of the child's special education and services needs." D.C. Mun. Regs. tit. 5, § 3005.9(h) (2006).

The crux of Ms. Parker's argument is that an occupational therapy evaluation and classroom observation were not completed. Plaintiff's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment ("Pl. Memo") [#29] at 12.

Dr. Mack did recommend that an occupational therapy evaluation be conducted, but it was ultimately decided by the MDT (which included Dr. Mack), and affirmed by the Hearing Officer, that it (and a functional behavior assessment) should be performed after the start of T.P.'s individual and group therapy sessions, and that the MDT should reconvene afterward to discuss the results. AR at 83, 85. No evidence has been presented to explain Ms. Parker's assertion that the failure to conduct this particular evaluation was harmful to T.P., particularly in light of the MDT's intention to conduct the evaluation and reconvene within 30 school days. Id. The Court thus sees no reason to displace the determination of the MDT and the Hearing Officer in regard to the occupational therapy evaluation.

As for the absence of classroom observation, it is true that the MDT "shall ensure that at least one team member other than the child's regular teacher observes the child's academic performance in the regular classroom setting." D.C. Mun. Regs. tit. 5, § 3005.10 (2006). An error based on classroom observation is only actionable, however, "if [that] procedural violation[] affected the student's *substantive* rights." LeSesne ex rel. B.F. v. Dist. of Columbia, 447 F.3d 828, 834 (D.C. Cir. 2006) (emphasis in original). Ms. Parker must demonstrate "that [Edison's] procedural violations affected [T.P.'s] ability to receive the educational benefit that the IDEA requires." Roark ex rel. Roark v. Dist. of Columbia, 460 F. Supp. 2d 32, 42 (D.D.C. 2006). No evidence has been presented that would support the notion that the MDT would have

come to a different conclusion had T.P. been observed in the classroom setting by someone other than her teacher.

A review of the record demonstrates that the evaluation conducted by Edison was broad and thorough. Many different tests were conducted by different evaluators, numerous people were interviewed (including Ms. Parker and T.P.'s teacher), and the results were analyzed by professionals who provided detailed reports. The MDT and the Hearing Officer based their decisions on those evaluations, and there is no evidence to suggest that T.P.'s substantive rights were violated by the absence of further testing.

### B. Compliance with § 38-2501

Ms. Parker argues that Edison failed to comply with the timetable set forth in D.C. Code § 38-2501. Pl. Memo at 9-11. That statute required Edison to "assess or evaluate" T.P. "within 120 days from the date that the student was referred for an evaluation or assessment." D.C. Code § 38-2501(a) (2001) (current version at D.C. Code § 38-2561(a) (Supp. 2008)). Ms. Parker's request to have T.P. evaluated was made on March 18, 2004, and T.P. was therefore to be "assess[ed] or evaluate[d]" by July 16, 2004. Id. The record demonstrates that all of the following evaluations were conducted on or before June 27, 2004: psycho-educational and clinical, speech and language, audiological, and social work. AR at 48, 60, 66, 70. As discussed previously, no further evaluations were necessary; consequently, T.P. was "assess[ed] or evaluate[d]" within 120 days of Ms. Parker's request. D.C. Code § 38-2501(a).

But, even if Ms. Parker had stated a violation, a procedural violation is only actionable "if those procedural violations affected the student's *substantive* rights." Lesesne, 447 F.3d at 834 (emphasis in original). Though Ms. Parker alleges that the "failure to timely evaluate and determine eligibility resulted in T.P. not being identified nor receiving special education or

8

related services," Pl. Memo. at 11, there is no evidence whatsoever to support the notion that the MDT would have come to a different conclusion had it met earlier. Any claims based on § 38-2501 are therefore not actionable. See, e.g., Roark, 460 F. Supp. 2d at 42 (denying challenge based on procedural error because parents did not offer "any evidence proving" that the error caused substantial harm); LeSesne ex rel. B.F. v. Dist. of Columbia, No. 04-CV-620, 2005 WL 3276205, at *9 (D.D.C. 2005) (holding that child was not harmed despite defendant's delinquency since, despite technical violation, child received a FAPE), aff'd, 447 F.3d 828.

    **C.**    **Eligibility for Special Education Services**

To be eligible for special education services a child must be designated as having "mental retardation, a hearing impairment including deafness, a speech or language impairment, a visual impairment including blindness, serious emotional disturbance . . . an orthopedic impairment, autism, traumatic brain injury, an other health impairment, a specific learning disability, deaf-blindness, or multiple disabilities, and who, by reason thereof, needs special education and related services." 34 C.F.R. § 300.7(a)(1) (2004) (current version at 34 C.F.R § 300.8 (2006)).[4]

Ms. Parker argues that "because T.P.'s diagnosis of adjustment disorder impeded her academic ability and social skills, the MDT team should have found T.P. eligible under 'Other Health Impaired.'" Pl. Memo. at 12. The relevant regulation, 34 C.F.R. 300.7 (2004), states in relevant part:

> Other health impairment means having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that--

---

[4] Special education services may be denied to a child with one of the qualifying conditions "if it is determined, through an appropriate evaluation, [that the child] only needs a related service and not special education." 34 C.F.R. § 300.7(2)(ii) (2004).

9

> (i) Is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia; and
>
> (ii) Adversely affects a child's educational performance.

34 C.F.R. 300.7(c)(9) (2004).

There are two flaws with Ms. Parker's argument. First, there is insufficient evidence that T.P. suffered from "limited strength, vitality, or alertness," a prerequisite of an "Other Health Impaired" diagnosis. Id. Though she references several examples of T.P.'s troubling behavior and academic performance, none of those examples implicate her strength or vitality, and they bear only minimal relation to her alertness. Pl. Memo at 14-15. Second, the only conditions listed within the definition that that might apply to T.P. are attention deficit disorder or attention deficit hyperactivity disorder ("ADHD"). 34 C.F.R. 300.7(c)(9)(i) (2004). Dr. Mack, while noting that T.P. exhibited symptoms of ADHD, concluded that T.P.'s "developmental history does not support a diagnosis [of ADHD] at this time." AR at 55. Ms. Parker presents no evidence to contradict that conclusion. See Jalloh ex rel. R.H. v. Dist. of Columbia, 535 F. Supp. 2d 13, 23 (D.D.C. 2008) (Plaintiff "presented no evidence in support of this claim, leaving the Hearing Officer to find that she had not proven her claim. The Court agrees."). See also Lyons by Alexander v. Smith, 829 F. Supp. 414, 418 (D.D.C. 1993) (affirming hearing officer's determination that student did not qualify as "other health impaired" because student's "alertness was not affected by his ADHD."). Nor does she suggest any other diagnosis or condition that would qualify T.P. for special education services.

**IV.   Conclusion**

Upon consideration of the administrative record and the giving due weight to the hearing officer's decision, the Court concludes that Ms. Parker has not alleged sufficient facts to prove,

10

by a preponderance of the evidence, that the hearing officer's determination is wrong. See Kerkam, 862 F.2d at 887 (stating that the party challenging an HOD must prove by a preponderance of evidence that the HOD is incorrect); Andersen by Andersen v. Dist. of Columbia, 877 F.2d 1018, 1019 (D.C. Cir. 1989) ("[W]e find nothing in the record to convince us that the plaintiffs successfully shouldered the burden of persuading the court that the hearing officers were wrong."). Accordingly, the Court grants defendant's motion for summary judgment and denies plaintiffs' motion for summary judgment.

An Order accompanies this Memorandum Opinion.

Dated: September 9, 2008                              /s/
                                        JOHN M. FACCIOLA
                                        UNITED STATES MAGISTRATE JUDGE